Filed 6/5/24  P. v. Garza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD ANTHONY GARZA,<br><br>    Defendant and Appellant. | F085630<br><br>(Super. Ct. No. CF92464473)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Elizabeth M. Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Hill, P. J., Levy, J. and Meehan, J.

Defendant Richard Anthony Garza pled no contest to second degree murder and admitted personally using a weapon in the commission of the offense. He was sentenced to an aggregate term of 15 years to life plus one year in state prison.[1] He filed a petition for resentencing, pursuant to former Penal Code section 1170.95[2] (§ 1172.6), based upon the changes to the felony-murder rule and the natural and probable consequences doctrine of aider and abettor liability effectuated by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). The trial court dismissed his petition, concluding that Senate Bill 1437 was unconstitutional. We reversed the court's order dismissing the petition and remanded.

On remand, the trial court considered defendant's statements at a parole suitability hearing in determining that defendant was ineligible for relief. On appeal, defendant contends the trial court's consideration of his statement from the parole suitability hearing was error. He further contends that if the error was forfeited, his counsel was ineffective. The People disagree on both accounts. We affirm.

**PROCEDURAL SUMMARY**[3]

On July 8, 1992, the Fresno County District Attorney filed an information charging defendant, Gilbert Gallegos, and Jessie Garcia with the murder of Eric Delgado (§ 187; count 1). Defendant was also charged with three counts of assault with a deadly

---

[1] Defendant was also convicted of robbery in a separate case. He was sentenced to a determinate term of two years on the robbery on the same date that the sentence was imposed in this case.

[2] All further statutory references are to the Penal Code. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

[3] On September 25, 2023, the People filed a request for judicial notice of portions of the record on defendant's prior appeal in this case. (*People v. Garza* (June 22, 2021, F080195) [nonpub. opn.].) Specifically, they sought judicial notice of defendant's resentencing petition, the prosecutor's and defendant's responsive filings, and the minute orders and written rulings by the trial court. On October 4, 2023, we granted the People's request. We rely, in part, on those documents in preparing this procedural summary.

2.

weapon (§ 245, subd. (a)(1); counts 2, 3 & 4). The information further alleged: as to count 1, defendant personally used a deadly weapon (§ 12022, subd. (b)), and as to all counts, defendant committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

On December 8, 1992, defendant pled guilty to second degree murder on count 1. Defendant also admitted the personal use of a deadly weapon allegation. In exchange, counts 2, 3, and 4, and the gang allegations were dismissed on the prosecution's motion.

On January 12, 1993, the trial court sentenced defendant to 15 years to life on count 1, plus a consecutive one-year weapon enhancement (§ 12022, subd. (b)).[4]

On January 15, 2019, defendant filed a petition for resentencing pursuant to section 1172.6. On October 16, 2019, the trial court granted the prosecution's motion to dismiss defendant's petition.

On June 22, 2021, we reversed the trial court's order dismissing defendant's petition and remanded for further proceedings.

After extensive briefing by the parties, on January 5, 2022, the trial court ordered the prosecution to show cause why defendant's petition should not be granted. (*People v. Garza*, *supra*, F080195.)

The prosecution submitted evidence and the parties submitted briefing prior to an evidentiary hearing. The prosecution submitted, among other things, a transcript of defendant's 2014 parole suitability hearing at which defendant testified under oath. Defendant objected to admission of the parole suitability hearing transcript on the basis that the transcript "should come within use immunity under the California Constitution."

---

[4] The trial court also sentenced defendant to a concurrent term of imprisonment on the same day in an unrelated offense.

On January 17, 2023, following an evidentiary hearing, the trial court denied defendant's petition, relying on defendant's statement in the parole hearing transcript and other evidence.

On January 19, 2023, defendant filed a notice of appeal.

**FACTUAL SUMMARY[5]**

At the section 1172.6 hearing, the prosecutor presented the original information, documents reflecting the change of plea, the sentencing hearing transcript, the death certificate and autopsy report for Delgado, and portions of defendant's 2014 parole suitability hearing in which he testified under oath. Defendant testified on his own behalf at the same hearing but presented no other evidence.

**1. The 2014 Parole Suitability Hearing Testimony**

On June 26, 2014, defendant testified under oath at his parole suitability hearing.

Defendant became a gang member at 17 or 18 years of age. On the day of the offense in this case, defendant and between two and five other people were drinking alcohol, using drugs, and driving around. Only two of the occupants of the vehicle carried knives. Defendant was not carrying a knife. They saw a "big crowd of people" at a convenience store and stopped the vehicle "to see what was going on." A woman that defendant knew to be Gallegos's girlfriend called him over to a different vehicle. Defendant could see that there were men in that vehicle and told Gallegos that his girlfriend wanted to talk to him. Defendant and Gallegos walked over to the other vehicle. Gallegos and his girlfriend then began arguing because his girlfriend was in a vehicle with other men, and she was upset that Gallegos had arrived with another woman.

Six or seven occupants of the vehicle Gallegos' girlfriend was in then exited the vehicle and began arguing with defendant and Gallegos, "identified themselves as"

---

[5]    Because defendant raises only legal issues and because we do not reach the issue of prejudice, the facts underlying the offenses are only minimally relevant and we provide only a limited factual summary.

members of a different gang, and surrounded them.  Defendant called to two of the other people he arrived with, and they came to assist.  The confrontation began to deescalate until one of defendant's companions made a derogatory statement regarding the other gang.  The two groups then began to fight.

One of the men in the other group "came at [defendant] with a knife and [defendant] … took it from him."  Defendant then used the knife "against him."  He stabbed the person he took the knife from six or seven times, then he chased the person and stabbed him additional times.  Defendant estimated he stabbed the person "maybe like 12 times."  At some point, while defendant was stabbing the person he took the knife from, that person was on a gate between the convenience store and the business next to it.  The man climbed the gate, "fell over the side[,] and took off running."  When asked who he used the knife against, defendant answered, "I ha[d] no idea who he was at the time.… But apparently I stabbed a few people.  That's on record so I guess it was [A.B.], [Delgado]," and A.V.  The person he took the knife from was the first person he stabbed.  Defendant was asked if he knew how many people he stabbed that day.  He answered, "No, sir.  I was intoxicated.  I was real drunk."  He later clarified that on that day, prior to the incident, he had used marijuana and PCP, and consumed alcohol.

Defendant testified in the same proceeding that he admitted that he stabbed someone in the back.  Based on the report he had seen, defendant understood that he had stabbed Delgado.  However, he denied having a personal recollection of who it was that he had stabbed in the back.  When asked why he stabbed Delgado, defendant answered, "I was angry.  I was with my gang associates and I was doing what they would do.  I was following their lead.  And I take responsibility for doing it."

Defendant further acknowledged that he had other options after he took the knife away from his attacker.  He had the option "[j]ust to leave [or] stop doing what [he] was doing …."  In hindsight, he thought he did not take one of those other options because he "was angry."  He "had a lot of [¶] … [¶] rage in [him]."

5.

## 2. The Autopsy Report

The autopsy report reflected that Delgado was stabbed a total of 16 times; 11 times on the back of his torso and five times on the front of his torso.

## 3. Defendant's Section 1172.6 Evidentiary Hearing Testimony

On May 2, 1992, defendant, three men (including codefendants Gallegos and Garcia), and a woman, planned to go to the Fresno fairgrounds. Defendant was not a gang member at the time.[6] He had been drinking alcohol and using drugs for most of the day. At approximately 11:00 p.m., the four others picked defendant up. On the way to the fairgrounds, they stopped at a convenience store because they saw a "[b]unch of youngsters [their] age." He had no plans to pick a fight and had no knowledge of any of his companions having such a plan. He did not know whether his companions had weapons in their possession, but he did possess a folding pocket knife with a three-inch blade.

Defendant and his companions approached a group of people because two of his companions knew some of the women. As defendant's group spoke to the women, Gallegos's girlfriend called to him from the passenger seat of another vehicle in the convenience store parking lot. Defendant and Gallegos walked over to speak with her. Gallegos's girlfriend continued to sit in the passenger seat and argued with Gallegos. Gallegos asked what she was doing in the vehicle with other men, attempted to open the passenger door, and attempted to convince her to come with defendant's group. The driver of the vehicle exited to confront Gallegos about the way in which he was handling the passenger door. Gallegos "got kind of aggressive with him" and said "[s]tay out of my business." The man responded, "No.… [M]y door is messed up." Some of the other

---

[6] He became a gang member and got a gang tattoo in prison. He testified that he was a gang member at the 2014 parole suitability hearing because the police report said he was a gang member and he "was trying to take responsibility."

men in the vehicle got out and surrounded defendant and Gallegos. Men from an adjacent vehicle did the same.

Some of the men surrounding defendant and Gallegos "started talking [like they wanted] to fight" but others "were trying to make peace." The men decided not to fight and the two groups began to shake hands. Defendant then heard a man toward the back of the other group say "F that s[**]t," and a fight broke out. Someone then grabbed defendant from behind. Defendant told the man who grabbed him to let go. The man did not, so defendant "panicked" and stabbed him one time on the left side of the abdomen. The person then released defendant and defendant backed away. Defendant fled to the check cashing business next door to the convenience store in the same strip of commercial buildings.

As defendant stood at the check cashing business, someone came up behind him. He turned and was "punched in the face" by a different man. Defendant chased the man and, as the man jumped over a three- to four-foot fence, defendant stabbed him in the back "three or four" times. Defendant then returned to the car that Gallegos's girlfriend was in when they arrived and saw that "everyone was gone." One of defendant's companions retrieved him, they got in the vehicle they arrived in, and they left. As they were driving away, defendant did not see anyone who appeared to be injured or appeared to have fallen from an injury when he left.

Defendant did not stab anyone other than the person who grabbed him from behind (whom he stabbed on the side of the abdomen) and the person who punched him (whom he stabbed in the back). Defendant denied that he stabbed Delgado. Defendant "did[ not] touch him … [and] was nowhere near him." At the 2014 parole suitability hearing, defendant testified that he stabbed Delgado. However, he did so because he was "attempting to take responsibility … [a]nd the only way [he] could do [so was] by admitting to something [he] didn't do." While the police and probation reports indicated that he stabbed Delgado, he did not "know who it was until [he] read the police report."

7.

At the 2014 parole suitability hearing, defendant said that he took a knife from someone who attacked him "[b]ecause that[ was] what [he] said to the homicide detectives … when they interviewed [him]."  At the same hearing, defendant said he did not know if his companions had knives in their possession.  That was true; defendant was unaware that his companions had knives until they used the knives during the fight.

## DISCUSSION

Defendant contends that the trial court's admission and consideration of the 2014 parole suitability hearing transcript was error because (1) it constituted an involuntary confession that should have been excluded under the due process clauses of the state and federal Constitutions, and (2) it violated his state and federal due process rights under the use immunity doctrine.  Defendant further contends, insofar as his claims were forfeited for failure to object below, his trial counsel was ineffective in failing to object.  Both arguments fail on their merits.

### 1.  Statutory Background

Effective January 1, 2019, Senate Bill 1437 limited accomplice liability under the felony-murder rule[7] and the natural and probable consequences doctrine.[8]  (§§ 188, 189, as amended by Stats. 2018, ch. 1015, §§ 2–3; *People v. Cruz* (2020) 46 Cal.App.5th 740,

---

[7]     Prior to Senate Bill 1437's enactment, " '[t]he felony-murder rule impute[d] the requisite malice for a murder conviction to those who commit[ted] a homicide during the perpetration of a felony inherently dangerous to human life.' " (*People v. Friend* (2009) 47 Cal.4th 1, 76.)

[8]     Prior to Senate Bill 1437's enactment, " ' "[a] person who knowingly aid[ed] and abet[ed] criminal conduct [was] guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commit[ted] [nontarget offense] that [was] a natural and probable consequence of the intended crime." ' " (*People v. Chiu* (2014) 59 Cal.4th 155, 161.)  " ' "[B]ecause the nontarget offense [was] unintended, the mens rea of the aider and abettor with respect to that offense [was] irrelevant and culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." ' " (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248 (*Lamoureux*).)

755; *Lamoureux*, *supra*, 42 Cal.App.5th at p. 246.) The Legislature's purpose was " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant of the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1(f).) Senate Bill 1437 achieves these goals by amending section 188 to require that a principal act with express or implied malice and by amending section 189 to state that a person can only be liable for felony murder if (1) the 'person was the actual killer'; (2) the person was an aider or abettor in the commission of murder in the first degree; or (3) the 'person was a major participant in the underl[y]ing felony and acted with reckless indifference to human life.' " (*People v. Cornelius* (2020) 44 Cal.App.5th 54, 57, abrogated on other grounds in *People v. Lewis* (2021) 11 Cal.5th 952, 961–962.)

"Senate Bill 1437 also [added former section 1170.95, now section 1172.6, which] established a procedure permitting certain qualifying persons who were previously convicted of felony murder or murder under the natural and probable consequences doctrine to petition the courts that sentenced them to vacate their murder convictions and obtain resentencing on any remaining counts." (*Lamoureux*, *supra*, 42 Cal.App.5th at p. 246; former § 1170.95, added by Stats. 2018, ch. 1015, § 4, renumbered by Stats. 2022, ch. 58, § 10, now § 1172.6.) Under that procedure, a convicted person is eligible for relief if the following conditions are met: "(1) A complaint, information, or indictment was filed against the [defendant] that allowed the prosecution to proceed under a theory of felony murder [or] murder under the natural and probable consequences doctrine .… [¶] (2) The [defendant] was convicted of murder … following a trial or accepted a plea offer in lieu of a trial at which the [defendant] could have been convicted of murder .… [¶] (3) The [defendant] could not presently be convicted of murder … because of [the] changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3).)

9.

Under that procedure, once a defendant has made a prima facie case for relief, the trial court is required to issue an order to show cause and hold an evidentiary hearing at which the People bear the burden of proving beyond a reasonable doubt that defendant could be convicted of murder or attempted murder under the law "as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subds. (c), (d)(1) & (3).) At the hearing, "admission of evidence in the hearing [is] governed by the Evidence Code"[9] and "[t]he prosecutor and the [defendant] may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

## 2. Forfeiture

At the evidentiary hearing on defendant's section 1172.6 petition, defendant objected to admission of the 2014 parole suitability hearing transcript on the basis that the statements fell within the use immunity doctrine. No objection was raised that admission of the transcript constituted admission of an involuntary confession in violation of the due process clauses of the state and federal Constitutions.

The failure to object to admission of evidence in the trial court generally forfeits a claim on appeal; a principle applicable to constitutional claims. (*People v. Myles* (2021) 69 Cal.App.5th 688, 696 (*Myles*); *People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) Defendant did not raise an objection to admission of the 2014 parole suitability hearing transcript on the basis that it constituted an involuntary confession. However, because defendant contends, assuming the issue is forfeited, his counsel was ineffective in failing to raise the issue below, we exercise our discretion to reach the merits of his claim to forestall the claim of ineffective assistance of counsel. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [an appellate court has

---

[9]     Section 1172.6, subdivision (d)(3) creates an exception to the general Evidence Code rules for admission of "evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed."

authority to reach a forfeited claim]; *People v. Crittenden* (1994) 9 Cal.4th 83, 146 [reviewing court may exercise discretion to consider forfeited claims to forestall ineffective assistance of counsel arguments].)

### 3.  Involuntary Confession

The due process clauses of "[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176; accord, *People v. Orozco* (2019) 32 Cal.App.5th 802, 819.)  A coerced or involuntary confession is inadmissible for any purpose.  (*People v. Jimenez* (2021) 73 Cal.App.5th 862, 875–876.)  " ' "The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' " (*Linton*, at p. 1176.)  " 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' [Citation.]  'Whether a confession was voluntary depends upon the totality of the circumstances.' " (*Ibid*.)  We independently review a trial court's legal determination regarding voluntariness where the facts surrounding an admission or confession are recorded and therefore not subject to dispute.  (*Id*. at pp. 1176–1177.)

In *Myles*, the Court of Appeal addressed the voluntariness of the defendant's statements at a parole hearing while considering her argument that the statements were entitled to use immunity.  (*Myles*, *supra*, 69 Cal.App.5th at pp. 705–706.)  The court noted that the defendant was not required to testify at her parole hearing, inasmuch as "parole cannot be conditioned on admission of guilt to a certain version of the crime." (*Id*. at p. 706, citing § 5011, subd. (b); Cal. Code Regs., tit. 15, § 2236; *In re Swanigan* (2015) 240 Cal.App.4th 1, 14; *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023.) Furthermore, the defendant was advised at the parole hearing that she had the option to not discuss the commitment offense and that choice would not be held against her. However, she chose to discuss the offense and testified under oath regarding her role in the crime.  "Having chosen to be truthful in the assessment interview and testify

11.

truthfully at the parole hearing, it is not fundamentally unfair to admit that information during a resentencing proceeding voluntarily initiated by [the] defendant bearing on some of the same issues." (*Myles*, at p. 706.)

Here, defendant contends in general that parole hearings are "inherently coercive" and, in this case in particular, his statements at the parole hearings were involuntary because the parole board commissioners "indicated at multiple points that appellant needed to acknowledge and understand his reasons for participating in the killing in order to be found suitable for parole." Defendant argues that his testimony before the parole board was not therefore aimed at providing a "detailed factual account of the events," but instead "taking responsibility although he had no recollection of stabbing Delgado." According to defendant, because the parole board places such a high premium on "remorse and the related concept of 'insight,' " defendants have "such a strong incentive to offer, exaggerate, or indeed fabricate self-incriminating testimony that a [defendant's] decision to inculpate himself cannot be deemed voluntary." (See also Cal. Code Regs., tit. 15, § 2281, subd. (d) [remorse and eight other factors are circumstances tending to show the prisoner is suitable for release on parole].) However, as defendant acknowledges, "[a] prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner." (Cal. Code Regs., tit. 15, § 2236; see § 5011, subd. (b) ["The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed"].) That defendant may have had an incentive to admit having committed the offenses of conviction does not suggest his will was overborne by official coercion, such that his statements were involuntary.

As a threshold matter, despite the "incentives facing people seeking parole," "[t]here is no categorical exclusion of a defendant's sworn parole hearing testimony" in the section 1172.6 petition process. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 586

12.

(*Mitchell*).) As the court pointed out in *Myles*, and defendant acknowledges here, he was not required to testify at his parole hearing. (*Myles*, *supra*, 69 Cal.App.5th at p. 706.) At the parole hearing in this case, the presiding commissioner asked defendant's counsel whether defendant "was willing to speak to the life crime today." Defendant's counsel responded, "He will regarding all matters." Defendant was given the option to not testify, acknowledged that he was advised of his hearing rights by his correctional counselor and attorney prior to the hearing, and was represented by counsel at the hearing. The record thus reflects that defendant was aware of his right to refrain from testifying in whole or in part and was guided by counsel in these decisions.

Moreover, none of the commissioners promised defendant release in exchange for admission of particular facts. (Cf. *People v. Gonzalez* (2012) 210 Cal.App.4th 875, 881, 884 [statement by parole agent that if defendant did not agree to speak with officers, parole agent would be forced to recommend that defendant serve maximum time in custody, knowing defendant feared returning to prison, rendered defendant's confession involuntary].) Rather, defendant was sworn to tell the truth. (See *Mitchell*, *supra*, 81 Cal.App.5th at p. 590 ["[t]he parole process emphasizes the importance of voluntary, unvarnished truthtelling"].) Defendant's contention at the parole hearing that he was "taking responsibility" in admitting the facts of the crime even though he did not recall what happened does not suggest that his testimony was involuntary. And while defendant contends that he was pressured to admit responsibility based on his 2004 parole denial at which he was purportedly told that he needed to " 'show remorse' " and " 'accept responsibility,' " he twice thereafter simply stipulated to unsuitability for parole and elected not to speak to the board. Defendant was aware of and previously exercised his right not to speak to the board. He elected at the 2014 parole hearing to speak to the parole board regarding the details of his offense under oath to tell the truth.

The totality of these circumstances does not suggest that defendant's parole board hearing testimony was involuntary or coerced. Accordingly, the trial court did not err in

13.

admitting defendant's statements from the parole hearing transcripts. We therefore do not address the parties' arguments regarding whether admission of this testimony was prejudicial and whether defendant's trial counsel was ineffective.

### 4. Use Immunity

Defendant contends the admission of his statements to the parole board violated his state and federal due process rights under the use immunity doctrine. We again disagree.

Use immunity is a judicial rule of evidence that effectuates the privilege against self-incrimination. (*People v. Coleman* (1975) 13 Cal.3d 867, 875, 889 (*Coleman*).) In *Coleman*, the defendant's criminal act was charged both as a violation of the defendant's then-current probation and a separate criminal act. The defendant testified at his probation violation hearing and the prosecution subsequently sought to use that testimony in their case-in-chief at the defendant's trial. Our Supreme Court held that the testimony was inadmissible: "[T]he testimony of a probationer at a probation revocation hearing held prior to the disposition of criminal charges arising out of the alleged violation of the conditions of his probation, and any evidence derived from such testimony, is inadmissible against the probationer during subsequent proceedings on the related criminal charges." (*Id*. at p. 889.)

The Supreme Court's holding rested on two "policies underlying the privilege against self-incrimination." (*Coleman*, *supra*, 13 Cal.3d at p. 875.) First, permitting prosecutors to use a defendant's probation revocation testimony to prove guilt at a subsequent trial for the same conduct would "substantially lighten[]" the prosecution's constitutional burden of proof. (*Id*. at p. 876.) This is because, ordinarily, "the privilege against self-incrimination requires the prosecution in a criminal trial to produce sufficient evidence to establish the defendant's guilt before he must decide whether to remain silent or to testify in his own behalf." (*Id*. at p. 875, italics omitted.)

Second, permitting prosecutors to use such testimony would force the defendant to choose between (1) testifying truthfully at the probation revocation hearing and possibly incriminating himself or herself while presenting any mitigating circumstances regarding the violation, (2) remaining silent at the probation revocation hearing and losing the opportunity to present a potentially compelling case against probation revocation, or (3) testifying falsely at the probation revocation hearing in a manner that will not damage his or her defense at a subsequent trial. (*Coleman, supra*, 13 Cal.3d at p. 878.) "Thus, when an alleged probation violation also constitutes a criminal offense for which the probationer might subsequently be prosecuted, he may be presented with the 'cruel trilemma' of self-accusation, perjury or injurious silence. To force an individual to choose one of three such unpalatable alternatives runs counter to our historic aversion to cruelty reflected in the privilege against self-incrimination." (*Ibid*.)

Several Courts of Appeal have declined to extend the rationale of *Coleman* to prohibit the use of parole hearing transcripts at section 1172.6 evidentiary hearings. In *Myles*, the Court of Appeal pointed out that the Fifth Amendment privilege against self-incrimination protects persons from being compelled to serve as a witness against themselves in " ' "any criminal case." ' " (*Myles, supra*, 69 Cal.App.5th at p. 705.) However, a section 1172.6 evidentiary hearing is not a trial de novo but an act of lenity extended to defendants already serving a valid sentence for murder. Accordingly, the *Myles* court held the use of parole hearing statements in such proceedings does not violate the defendant's Fifth Amendment rights. (*Myles*, at pp. 705–706.)

In *People v. Duran* (2022) 84 Cal.App.5th 920, the Court of Appeal noted that "cases applying *Coleman*'s use immunity are … limited to situations where a defendant's prior statements might be later used against him *in a manner that offends the privilege against self-incrimination*." (*Id*. at p. 929 [collecting cases].) The court determined there were two reasons why "this brand of use immunity does not apply to bar the use of a defendant's prior statements in a parole risk assessment at a subsequent section 1172.6

15.

evidentiary hearing." (*Id*. at p. 930.) First, because the section 1172.6 evidentiary hearing is not a " 'criminal case' " or " 'cause,' " it does not implicate the privilege against self-incrimination. (*Duran*, at p. 930.) "Once a defendant's 'sentence has been fixed and the judgment of conviction has become final,' the 'general rule' is that 'there can be no further incrimination' and hence 'no basis for the assertion of the privilege.' " (*Ibid*.) Because the section 1172.6 hearing is itself neither a subsequent retrial nor a new sentencing, "*Coleman*'s core rationale—and hence its holding—is not implicated." (*Duran*, at p. 931.) Second, the *Duran* court noted that *Coleman* made clear that use immunity does not apply "when a defendant's prior statements are to be introduced 'for purposes of impeachment' because the privilege against self-incrimination 'does not … encompass a right of an accused to lie.' " (*Duran*, at p. 931.) Thus, even assuming *Coleman* applied, the court would have held the parole suitability hearing transcript admissible, to the extent it was inconsistent with defendant's testimony at the section 1172.6 hearing regarding his involvement in Delgado's death. (*Id*. at pp. 931–932.)

Other courts have reached similar conclusions. (*Mitchell*, *supra*, 81 Cal.App.5th at pp. 588–590 [declining to equate the § 1172.6 evidentiary hearing with a criminal prosecution for purposes of use immunity]; *People v. Anderson* (2022) 78 Cal.App.5th 81, 88–93 [rejecting the argument that *Coleman* use immunity is not predicated on the constitutional privilege against self-incrimination]; but see *Mitchell*, at pp. 602–605 (dis. opn. of Stratton, P. J.) [*Coleman* is not limited to the privilege against self-incrimination and applies if the use of prior testimony would be fundamentally unfair].) Defendant cites no cases to the contrary in this context. He simply argues that the cases we cite were incorrectly decided.

Defendant does not provide a compelling justification for deviating from the holding that the Fifth Amendment privilege against self-incrimination does not apply to the section 1172.6 evidentiary hearing. He merely points out that, in this context,

defendants have the right not to take the stand and the prosecution's burden of proof at the evidentiary hearing is beyond a reasonable doubt. However, that right and burden are statutory rather than constitutionally imposed. Furthermore, as the *Duran* court pointed out, a defendant's conviction remains intact and presumptively authorized during the pendency of the hearing. (*Duran*, *supra*, 84 Cal.App.5th at p. 931.) While defendant is correct that defendant's own statements from a parole hearing can have adverse consequences for a section 1172.6 petition, those consequences would not be new; failure of the petition would result in defendant's conviction and sentence staying intact.[10] It is for this reason that "the panoply of rights that attach at trial do *not* apply during a section 1172.6 evidentiary hearing." (*Duran*, at p. 931.)

Accordingly, we join other courts that have considered this issue and hold that *Coleman*'s use immunity does not extend to exclude defendant's parole hearing testimony from the section 1172.6 evidentiary hearing. We therefore again decline to address the parties' arguments regarding whether the admission of this testimony was prejudicial and we need not address defendant's ineffective assistance of counsel claim.

## DISPOSITION

The order is affirmed.

---

[10] The *Mitchell* court correctly noted: "A petition under … section [1172.6] is not a criminal prosecution. [Citation.] It is the *opposite* of a criminal prosecution. A criminal prosecution can only hurt a defendant and can never help. The process here is the reverse: it can only help the defendant and can never hurt." (*Mitchell*, *supra*, 81 Cal.App.5th at p. 588.)

17.